## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

JODI M.,

                                Plaintiff,

        v.                                         5:20-CV-650
                                                          (ATB)

COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                                Defendant.

---

STEPHEN R. DOLSON, ESQ., for Plaintiff
MOLLY E. CARTER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

### MEMORANDUM DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 5).

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for Disabled Widows Benefits[1] ("DWB") and Supplemental Security Income ("SSI") on November 16, 2016, alleging disability beginning September 16, 2015.[2] (Administrative Transcript ("T") at 104-105,

---

[1] Plaintiff was previously determined to be the unmarried widow of the deceased insured worker, and this application was based on his insured status. (T. 151). Plaintiff met the "non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act. (*Id.*)

[2] It appears from the record that plaintiff has filed three previous applications for Social Security benefits, in 2008, 2011, and 2013. All of the previous applications were denied and closed at different stages of the appeal process. (T. 107). These previous applications are not relevant to the instant application.

107).  Her application was denied initially on March 13, 2017.  (T. 104, 105, 116, 149).

At plaintiff's request, Administrative Law Judge ("ALJ") Melissa Mammock conducted

a video hearing on February 6, 2019, at which plaintiff testified. (T. 78-103).

Vocational expert ("VE") Dr. Dothel Edwards testified by telephone. (T. 97-102).  On

April 18, 2019, ALJ Hammock issued an unfavorable decision. (T. 149-67).  The ALJ's

decision became the Commissioner's final decision when the Appeals Council denied

plaintiff's request for review on May 6, 2020. (T. 1-4).

## II.   GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI

disability benefits must establish that he is "unable to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In

addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such  severity
> that he is not only unable to do his previous work but  cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be hire
> if he applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20

C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI

disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in Appendix 1 of
> the regulations. If the claimant has such an impairment, the
> [Commissioner] will consider him disabled with-out considering
> vocational factors such as age, education, and work experience…
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work. Finally, if the
> claimant is unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from performing

his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v.*

*Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir.

2012). It must be "more than a scintilla" of evidence scattered throughout the

administrative record. *Id.* However, this standard is a very deferential standard of

review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

3

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III. **FACTS**

Plaintiff was born on November 13, 1962, was 56 years old at the time of the ALJ hearing and was 52 years 10 months old at the alleged date of onset. (T. 106).  In the paperwork associated with her application, plaintiff alleged that she was disabled due to depression, anxiety, a "left hand impairment with trigger finger," a "right hand impairment," bilateral carpal tunnel syndrome, and "left shoulder torn rotator cuff."[3] (T.

---

[3] The court notes that the issues in this action relate only to plaintiff's mental impairments. Plaintiff does not make any arguments relating to her physical condition.

107).  At the time of the hearing, plaintiff lived by herself in a mobile home. (T. 82).
She testified that her financial support came from Social Services. (*Id.*)

Plaintiff stated that she had a driver's license but did not drive because she did
not have a car. (T. 82-83).  She was able to "get places" because her children or her
father took her. (T. 83).  She testified that she had no access to public transportation
near her home, and that there was nothing in walking distance. (*Id.*)  Plaintiff had a high
school education and prior work experience as a production assembler, printer machine
operator, and circuit board maker. (T. 83, 99).  Plaintiff last worked in 2008 as a "cable
connector," which involved placing connectors on cables for televisions. (T. 83-84).
Plaintiff testified that the job also involved soldering circuit boards. (T. 84).  Plaintiff
also discussed the job requirements of her other past employment. (T. 85-89).

Plaintiff testified that she was unable to work because she had "very bad
depression and anxiety." (T. 89).  Plaintiff stated that she was being treated by a
counselor and that she saw a "doctor once a month," who prescribed her medications.
(T. 89).  She testified that the medications "do help." (T. 90).  However, despite the
medication, plaintiff stated that she still suffered from anxiety attacks from five to
seven times per day which lasted "like 15 minutes." (T. 90).  When she had one of these
attacks, she became very anxious, had a hard time breathing, and began to shake. (*Id.*).
She did not know what triggered these attacks, but testified that she was taking
medication regularly for this problem. (T. 90-91).

In response to questioning by counsel, plaintiff also discussed her physical
impairments.  She stated that she had a trigger finger "release" in 2008, and her hands

still "bother" her, but that she was not getting any treatment for the condition. (T. 91). Plaintiff also testified that two years prior to the hearing, she underwent a nerve block in her neck, which helped, although she still felt a "tingling in her finger" once per day. (T. 91-92).  Plaintiff believed that this tingling may be caused by the way she sat, but she could relieve it by rolling her shoulder. (T. 92).

Plaintiff testified that she was able to take care of her personal care and all the chores around the house by herself. (T. 93).  She stated that she tried to get out to the store once per week and sees her psychologist every other week. (*Id.*)  She stated that she shops on her own, but her daughter takes her to the store. (*Id.*)  In response to a question from her attorney, plaintiff testified that she could have anxiety attacks in the store, but that it depended where she went. (T. 93-94).  She stated that "I just - - I get very anxious about going." (T. 94).  Plaintiff testified that she believed that she became anxious because she was going to be around a lot of people, but that she would be comfortable being around five people. (*Id.*)  She did attend family gatherings, but "sometimes" could be anxious about those.[4] (*Id.*)

Plaintiff testified that she was usually up in the morning by 7:30 a.m. (T. 94). She got coffee, brushed her teeth, made breakfast, and then if there were any chores to do, she would try to get them done in the morning. (T. 94).  She might sit and read novels. (*Id.*)  Plaintiff testified that she had no trouble following the story. (*Id.*) Plaintiff's counsel asked whether her mental impairments resulted in good and bad days. (T. 94-95).  Plaintiff responded in the affirmative and stated that, on a good day,

---

[4] Plaintiff's counsel asked her if she had "the anxiety attacks [at family gatherings] or in anticipation of those events?" (T. 94).  Without explanation, plaintiff responded - "Sometimes." (*Id.*)

she would have fewer anxiety attacks. (T. 95).  Plaintiff stated that a "good" day would result in approximately four anxiety attacks, while a bad day could produce up to seven anxiety attacks. (*Id.*)  Plaintiff testified that she had two good days and five bad days per week. (*Id.*)  On a good day, plaintiff can "sit and relax sometimes and not worry about having a panic attack." (*Id.*)

Plaintiff testified that she took medication to help her sleep, and she was able to sleep between seven and eight hours per night. (T. 95-96).  Plaintiff stated that she was taking Gabapentin for her anxiety. (T. 96).  She testified that sometimes the medication would make her feel as if she was "falling," but this did not affect her balance or her ability to move around. (*Id.*)

## IV. **THE ALJ'S DECISION**

At step one of the sequential evaluation, the ALJ found that plaintiff had not engaged in substantial gainful activity since her alleged date of onset on September 16, 2015. (T. 151).  At step two of the evaluation, the ALJ found that the plaintiff had the following severe impairments: generalized anxiety disorder, unspecified depressive disorder, mild left shoulder osteoarthritis, cervical stenosis and radiculopathy, and carpal tunnel syndrome status post bilateral release. (T. 152-53).

However, at step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment. (T. 153-56).  With respect to plaintiff's physical impairments, the ALJ considered Listing 1.02 (major dysfunction of a joint) for plaintiff's left shoulder impairment; Listing 1.04 (disorders of the spine) for plaintiff's cervical impairment; and Listing

7

11.14 (peripheral neuropathy) for plaintiff's carpal tunnel syndrome. (T. 153-54). With respect to plaintiff's mental impairments, the ALJ considered Listing 12.04 (depressive, bipolar, and related disorders) and Listing 12.06 (anxiety and obsessive-compulsive disorders). (T. 154-56).

At step four of the analysis, the ALJ found that plaintiff had the physical RFC to perform light work, except that she could frequently reach, handle, and finger bilaterally. (T. 156).  The ALJ determined that plaintiff could frequently stoop, kneel, crouch, and crawl, but she could only occasionally climb ladders, ropes, and scaffolds. (*Id.*)  Plaintiff must "avoid concentrated exposure to hazards." (*Id.*)  Mentally, plaintiff could perform simple and complex tasks, but not at a "production rate pace." (*Id.*)  She could tolerate no more than occasional interaction with supervisors, co-workers, and the public. (*Id.*)  Plaintiff was limited to low-stress work, requiring no more than occasional decision-making and no more than occasional changes in the work setting. (*Id.*)

In determining the plaintiff's RFC, the ALJ reviewed the medical evidence and plaintiff's stated symptoms, both at the hearing and to her medical providers.  The ALJ found that the medical evidence did not support the severity of symptoms or functional limitations that plaintiff alleged in her statements and testimony. (T. 161).  The ALJ then discussed the weight that she afforded to the medical opinions of record. (T. 161-64).  Based on the above RFC and the testimony of VE Edwards, the ALJ determined that plaintiff could perform her past relevant work as a printer machine operator and circuit board maker. (T. 165).  However, the ALJ also made an alternative step five

finding that there were other jobs in the national economy that plaintiff could perform

by using the Medical Vocational Guidelines as a framework and relying on the VE's

testimony. (T. 165-66).

There are a substantial number of relevant medical records in the file.  However,

rather than summarizing the medical records at the outset, I will refer to the pertinent

records and proceedings during my discussion of the plaintiff's arguments.

## V.   <u>ISSUES IN CONTENTION</u>

Plaintiff raises the following argument in support of his position that the ALJ's

decision is not supported by substantial evidence:

1.   The ALJ failed to properly apply the treating physician rule. (Plaintiff's
     Brief ("Pl.'s Br.") at 5-11) (Dkt. No. 11).

Defendant argues that the Commissioner's decision is supported by substantial

evidence. (Defendant's Brief ("Def.'s Br.") at 4-19) (Dkt. No. 14).  For the following

reasons, this court agrees with the defendant and will affirm the Commissioner's

decision.

## VI.   **WEIGHT OF THE EVIDENCE/TREATING PHYSICIAN**

### A.   **Legal Standards**

In making a determination, the ALJ weighs all the evidence of record and

carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL

374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues

are not "medical issues," but are "administrative findings."  The responsibility for

determining these issues belongs to the Commissioner.  *See* SSR 96-5p, 1996 WL

374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a

listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that she applies and the weight that she accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ."[5] *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If an ALJ decides not to give the treating source's records controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a

---

[5] The court notes that the Social Security regulations have been amended.  For applications after March 2017, the regulations have eliminated the provision that treating physicians are entitled to "controlling" weight in certain circumstances. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  However, plaintiff's application in this case is governed by the pre-March 2017 regulations and the treating physician rule.

specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)).  "[T]he ALJ must 'give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion.' " *Id.* at 96 (citing *Halloran v. Barnhart*, 362 F.3d at 32).  Should an ALJ assign less than controlling weight to a treating physician's opinion and fail to consider the above-mentioned factors, this is a procedural error.  *Id.*  It is impossible to conclude that the error is harmless unless a "searching review of the record . . . assures us that the substance of the treating physician rule was not traversed." *Id.*

**B.    Analysis**

Plaintiff argues that the ALJ failed to properly consider the mental Medical Source Statement ("MSS") submitted by Dr. Paula Zebrowski, M.D., plaintiff's "treating psychiatrist," on February 13, 2019. (T. 999-1003).  The MSS is part narrative and part "check box." (*Id.*)  The narrative portion of the MSS states, in part, that plaintiff was "admitted 4/3/17 and seen weekly or biweekly since." (T. 999).  The MSS includes a long "check box" list of the patient's "symptoms," and a "check box" list of the plaintiff's limitations on "work-related activities." (T. 1000, 1001-1002).

In the list of plaintiff's work-related limitations, Dr. Zebrowski noted that plaintiff was "seriously limited" in her ability to remember work-like procedures, understand and remember very short and simple instructions, interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanness. (*Id.*)  Dr. Zebrowski noted that plaintiff was "unable to meet competitive standards" in her ability to carry out very short and simple

11

instructions, make simple work-related decisions, and ask simple questions or request assistance. (T. 1001).

Finally, Dr. Zebrowski noted that plaintiff's had "no useful ability to function" in the areas of maintaining attention for a two-hour segment, maintaining regular attendance and being punctual within customary, usually strict tolerances, sustaining an ordinary routine without supervision, working in coordination or in close proximity to others without distraction, completing a normal workday and workweek without interruption from psychologically-based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, being aware of normal hazards and taking appropriate precautions, understanding, remembering, and carrying out detailed instructions, setting realistic goals, dealing with the stress of semi-skilled and skilled work, traveling in an unfamiliar place, and using public transportation. (T. 1001-1002).

The ALJ stated that she "considered, but [gave] little weight to the mental functional capacity questionnaire, dated February 13, 2019 and completed by psychiatrist, Paula Zebrowski, M.D." (T. 162).  The ALJ noted that Dr. Zebrowski's MSS "asserted that the claimant had the equivalent of marked or extreme limitations in all functional domains in this questionnaire." (*Id.*)  The ALJ found that the record did not contain any evidence of a treating relationship between plaintiff and Dr. Zebrowski

prior to November 2018, four months prior to the completion of the MSS. (*Id.*)  Dr. Zebrowski examined plaintiff once on November 15, 2018, and there were no additional records from her after that appointment. (T. 162, 925-26).  The ALJ noted that during the one appointment with Dr. Zebrowski, the plaintiff "even subjectively denied the severity of symptoms asserted [in Dr. Zebrowski's MSS]." (T. 162). The ALJ also stated that the evidence of record was not consistent with Dr. Zebrowski's MSS because "when the claimant is compliant with her medications, her symptoms remain at baseline and result in no more than moderate symptoms or impairment to functioning." (*Id.*)

### 1.   Treating Relationship

Defendant first argues that Dr. Zebrowski is not entitled to controlling deference because she is not a "treating source" for purposes of social security, because she only examined the plaintiff once in 2018, four months prior to issuing her MSS.  Plaintiff argues that the ALJ referred to Dr. Zebrowski as plaintiff's treating psychiatrist, and plaintiff named Dr. Zebrowski as her treating psychiatrist in paperwork, dated October of 2018.[6]  Plaintiff also argues that Dr. Zebrowski is "part of a large practice"[7] which provided care to plaintiff over an extended period of time. (Pl.'s Br. at 10).  Finally, plaintiff argues that the record may be incomplete because plaintiff began to attend

---

[6] Plaintiff argues that this shows she saw Dr. Zebrowski prior to the November 2018 appointment, but that the records might be missing from the transcript.

[7] Circare is an agency which provides comprehensive services and programs to individuals diagnosed with mental illness. https://www.cir.care/about/history.  One of its clinics provides outpatient individual and family therapy as well as psychiatric evaluation and medication treatment. *Id.* It does not appear to be a "practice" as contemplated by plaintiff's argument, and there are a variety of providers who work for this agency.

sessions at Circare in April of 2017, and states that she saw staff weekly, but there are insufficient records documenting these visits in the transcript.  Such a "gap" requires the court to remand for further evaluation.

The Second Circuit specifically rejected one of plaintiff's treating physician arguments in *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011).  The court held that the opinion of a treating physician is given greater weight due to her "'unique position resulting from the '*continuity* of treatment [s]he provides and the doctor/patient relationship [s]he develops.'" *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n. 2 (2d Cir.1983) (per curiam)) (emphasis added by original, alterations added).  The court stated that a physician who only examined the claimant once or twice did not develop a physician/patient relationship with the individual, even though others "in the same facility" had submitted medical opinions on her behalf. *Id. See also Shiela G. v. Comm'r of Soc. Sec.*, No. No. 5:19-CV-1298 (CFH), 2021 WL 1027047, at *4-5 (N.D.N.Y. Mar. 17, 2021) (declining to afford treating physician deference to a physician who saw plaintiff with a "frequency well below that which the uncontroverted medical evidence indicates was customary for such treatment."); *Ryan B. v. Comm'r of Soc. Sec.*, 6:19-CV-1448 (ATB), 2020 WL 6888100, at *11 (N.D.N.Y. Nov. 24 2020) ("[H]aving seen the plaintiff only once, it is questionable that Dr. Cherukuri would have been considered a treating physician at the time that he completed the form report in June of 2018."); *Sanchez v. Berryhill*, No. 16-CV-7775 (PGG/DF), 2018 WL 1472687, at *18 (S.D.N.Y. Feb. 28, 2018) (finding that physician's two documented meetings with the plaintiff did not constitute the requisite

14

"on going relationship" sufficient to accord treating physician status even though doctors worked in a "common facility").

In this case, although Dr. Zebrowski stated that plaintiff was "admitted" to Circare in April of 2017 and was seen weekly or biweekly until the 2019 MSS, it is clear from the admission evaluation, that the staff members evaluating plaintiff were social workers, and one nurse practitioner, and there is very little information regarding plaintiff's functional abilities in those records. (T. 888-926). In her MSS, Dr. Zebrowski did not state that *she* saw plaintiff weekly or biweekly since 2017. The last examination report from Circare in the record before the 2019 MSS is the one report authored by Dr. Zebrowski in November of 2018. (T. 925-26). She spent thirty minutes with the plaintiff. (T. 925). Thus, it is unlikely that Dr. Zebrowski would be considered a "treating physician" for purposes of the social security regulations based on the evidence of record.[8]

### 2.    Weight of the Evidence

Even assuming that Dr. Zebrowski is a treating physician for purposes of social security, a treating physician's opinion need not be given controlling weight if it is "not consistent with other substantial evidence in the record." *Halloran, supra.* In this case, in addition to noting the lack of treating relationship, the ALJ discussed the inconsistencies between Dr. Zebrowski's MSS, her in-person examination notes of November 2018, and the other substantial evidence of record when determining to give her MSS "little weight." (T. 162). In doing so, the ALJ covered all the factors outlined

---

[8] The court will discuss the potentially "missing" records below.

in *Burgess*.  Even though the relevant *Burgess* factors may not all have been discussed

in the same part of the ALJ's opinion, consistency with the other evidence in the record

and supportability of the opinions were thoroughly discussed during the course of the

her decision.

> In her November 15, 2018 report Dr. Zebrowski stated

>> Jodi is a 56 year old white female who presents for ongoing
>> treatment of generalized anxiety disorder and unspecified
>> depressive disorder.  Jodi comes in today doing "okay." . . .
>> Her mood is stable with some anxiety.  Jodi appears anxious
>> in our meeting but relays that she is not anxious most of the
>> time.  She celebrated her birthday and had a good time.  She
>> and her daughter will be cooking for Thanksgiving.  Sleep is
>> restorative.  Energy is adequate.  Interest is intact.  She enjoys
>> reading, taking care of the house, and taking care of her
>> grandchildren.  There is no suicidal or homicidal ideation.
>> Good family connections are supportive.  No side effects are
>> reported regarding any of her current medications.  There are
>> no abnormal movements noted.  No further adjustment in
>> medication is warranted or desired by patient.

(T. 925).  Dr. Zebrowski continued plaintiff on her current medications, with no

changes.  This narrative was followed by a "Treatment Plan," which noted that plaintiff

suffered from "cognitive and physiological responses to anxiety" and that her goal was

to stabilize her anxiety level while increasing her ability to function on a daily basis.

(*Id.*)  With respect to her depression, Dr. Zebrowski noted that plaintiff's goal of

alleviating her depressed mood and returning to her previous level of effective

functioning was "ATTAINED 6/5/18." (*Id.*)

Dr. Zebrowski then stated that plaintiff would be evaluated by "clinic psychiatric

staff" and should take medications as prescribed. (*Id.*)  Dr. Zebrowski also stated that

16

plaintiff should begin to explore preferences for "enjoyable recreational activity and other avenues to increase meaning and purpose (employment, volunteer work, social organizations, etc.) (T. 926). This narrative report is inconsistent with the February 2019 MSS which finds marked and extreme limitations in almost every category of functioning without an updated examination. In fact, the court notes that the MSS begins by stating that "Jodi has had ongoing medication and psychotherapy. She has significantly improved." (T. 999). It is unclear how "significant improvement" is consistent with the limitations that Dr. Zebrowski checks on the subsequent pages of the report, particularly given the moderate symptoms noted on plaintiff's intake interview.

Plaintiff's intake evaluation at Circare, written by Sarah Strieb, LMSW, states that plaintiff came to Circare because the doctors at "CPEP"[9] told her that she should get therapy and medications from the same place. During her intake interview, plaintiff told LMSW Strieb that she suffered from anxiety and depressed mood, including diminished interest and low energy. (T. 888). Plaintiff stated that she enjoyed spending time with her children and grandchildren, and that she used to knit and crochet, but did not do those things anymore due to a physical impairment. (T. 893).

LMSW Stieb's interpretive summary states that plaintiff complained of symptoms of anxiety that have been "troublesome" and warranted mental health

---

[9] CPEP is the acronym for Comprehensive Psychiatric Emergency Program. https://www.sjhsyr.org/find-a-service-or-specialty/behavioral-health/comprehensive-psychiatric-emergency-program-cpep. "CPEP provides evaluation and treatment for individuals of all ages who are suffering from an acute mental health crisis. Referrals to CPEP are from a variety of community agencies, as well as from individuals or their family members." *Id.*

treatment for many years. (T. 896).  Although plaintiff stated that she had been previously diagnosed with schizophrenia and bipolar disorder, there was no evidence of symptoms that would support those diagnoses. (*Id.*)  Plaintiff's thoughts were "linear, logical, and appear to be reality based." (*Id.*)  Her mood was anxious and her affect was congruent but restricted. (*Id.*)  She endorsed various anxiety symptoms, including excessive uncontrollable worry, feeling on edge, difficulty falling and staying asleep, low energy, poor self image, and difficulty concentrating. (*Id.*)  Plaintiff described her prior suicide attempt, but stated that it was "impulsive" and was related to increased stress following her divorce. (*Id.*)

Test were administered to gauge her level of depression and anxiety. (T. 900-902).  The result of the Patient Health Questionnaire - 9 ("PHQ-9"), which tests for depression, was in the range of "Minor Depression" and "Major Depression-Mild." (T. 900-901).  This is consistent with a report from Oswego Hospital, dated February 17, 2017, which noted that plaintiff's major depression was "in complete remission." (T. 455).  The Generalized Anxiety Disorder -7 ("GAD-7") scale resulted in a score of 13. (T. 902).  Although the scale for anxiety disorders was not included in the record, a score of 13 indicates moderate anxiety. https://patient.info/doctor/generalised-anxiety -disorder-assessment-gad-7.

The mental status examination, conducted at plaintiff's 2017 Circare intake interview indicated that plaintiff's appearance was within normal limits, she was "tense," but her eye contact was "average," and her "activity" was within normal limits. (T. 916).  Her mood was anxious and her affect constricted, but her speech was clear,

her thought processes were logical, and her perception and thought content were within normal limits. (T. 918).  Her cognition, insight, and judgment were within normal limits, and her intelligence was average. (T. 918).  Thus, even upon intake, plaintiff's limitations were not as great as Dr. Zebrowski indicated in her MSS.[10]

On June 19, 2017, plaintiff was interviewed by Tammy Balamut, a psychiatric mental health nurse practitioner ("NP") at Circare. (T. 921-24).  NP Balamut stated that plaintiff's depression was "chronic and stable" with use of medication. (T. 922). Plaintiff stated that the depression was "aggravated by family issues." (*Id.*)  Plaintiff reported that she slept six hours per night, with a fair quality of sleep.  Plaintiff stated that her interests involved doing puzzles on her computer and going to her daughter's house every weekend to spend time with her grandchildren. (T. 921).  Plaintiff stated that she did not have friends and knew when her depression became "unbearable" because she would get tired and "isolated." (*Id.*)  Plaintiff stated that "she planned to do therapy twice a month," which would be sufficient at this time. (T. 922).  There was no further analysis of functional abilities, and NP Balamut did not include a mental status evaluation in her report.  The next document from Circare is Dr. Zebrowski's November 16, 2018 report, discussed above.  None of the Circare records mention the marked and extreme limitations noted by Dr. Zebrowski in her MSS.

The ALJ gave the greatest weight to the consultative opinion authored by psychologist Jeanne Shapiro, Ph.D., dated February 17, 2017. (T. 161-62, 446-50).  The

---

[10] As stated above, Dr. Zebrowski indicated in her MSS that plaintiff had significantly improved.  Based on the intake evaluation, if plaintiff had "significant improvement," she could not have been as limited as Dr. Zebrowski found in her MSS.

ALJ found that Dr. Shapiro's report was the most consistent with the plaintiff's longitudinal record.[11] (T. 161-62).  Dr. Shapiro noted that plaintiff's demeanor and responsiveness to questions was cooperative and that her social skills and presentation were "adequate." (T. 448).  Her personal hygiene and grooming were good, her motor behavior was normal, and her eye contact adequate. (*Id.*)  Her speech was fluent, and the quality of her voice was clear.  Her affect was congruent with her thoughts and speech. (*Id.*)

Plaintiff was mildly anxious, tense, and apprehensive, but her attention and concentration and recent and remote memory were "intact."  Her intellectual functioning was in the low-average range, and her general fund of knowledge was appropriate to her experience. (T. 449).  Her insight and judgment were poor.  Dr. Shapiro found that vocationally, the plaintiff appeared to have no limitations in understanding and following simple instructions, and performing both simple and complex tasks and in learning new tasks. (*Id.*)  Dr. Shapiro further stated that plaintiff might have mild to moderate limitations in attention and concentration, depending on the level of her anxiety. (*Id.*)  Plaintiff appeared to have mild to moderate limitations in maintaining a schedule and making appropriate decisions.  She had moderate limitations in her ability to consistently relate to and interact with others and deal with

---

[11] The ALJ also noted that Dr. Shapiro's report was also consistent with the findings and the evidence cited in a prior ALJ's decision concerning "the previously adjudicated period which ended the day before the claimant's alleged disability onset date in this decision . . . ." (T. 161-62).  The court does note that the ALJ did not adopt Dr. Shapiro's diagnosis of agoraphobia because none of the plaintiff's treating providers made such a diagnosis, and plaintiff engaged in activities that were inconsistent with such a diagnosis. (T. 152-53).

stress.[12] (*Id.*)  The ALJ accommodated plaintiff's mild to moderate restriction in attention and concentration[13] and her moderate limitation in relating to others by limiting plaintiff's work to only "occasional contact" interaction with others and limiting plaintiff to jobs which did not require a "production rate pace." (T. 156).  Her moderate limitations were also taken into consideration by restricting plaintiff to "low-stress work, requiring no more than occasional decision-making and no more than occasional changes in the work setting."[14] (*Id.*)

In her analysis, the ALJ recognized that the plaintiff had a period during which her symptoms exacerbated from October 2016 until December 2016. (T. 161).  The ALJ discussed the medical evidence that was developed during, prior to, and after this period of exacerbation.  The ALJ noted that during the period of exacerbation of symptoms, the plaintiff had questionable compliance with her treatment and, at one point, admitted to smoking marijuana "daily." (T. 161).  The ALJ stated that the plaintiff underwent counseling with David Blair, LCSW from August 2015 to December 2015, when she ceased treatment. (T. 158).  Even though LCSW Blair's handwritten notes were mostly illegible, the ALJ properly noted that "subjectively," at the time she ceased therapy, she was reporting depression and anxiety symptoms of

---

[12] Plaintiff told Dr. Shapiro that she got along with family, but she had no friends. (T. 449).

[13] Dr. Shapiro stated that plaintiff's limitation on attention and concentration for tasks would be "mild-moderate" "depending upon her level of anxiety." (T. 449).  Presumably this indicates that she would have mild limitations, but could have moderate limitations if her anxiety were greater.  In any event, this determination is inconsistent with Dr. Zebrowski's findings.

[14] Dr. Shapiro's opinion that plaintiff would have only a mild to moderate limitation in attending to a routine and maintaining a schedule is inconsistent with Dr. Zebrowski's MSS and her determination that plaintiff would be absent more than four days per month. (T. 449, 1003).

only 3-4 out of 10. (T. 158, 414).  The ALJ also noted that in May of 2016, plaintiff's then-treating nurse practitioner, Donna Devine observed that plaintiff had "an entirely normal neurological examination and a normal mood and affect."[15] (T. 158, 932-33).

Beginning in October of 2016, plaintiff had a series of visits to CPEP, sometimes spending the night, and sometimes presenting more than once per day, but most of the time her visits followed stressful family events, including conflicts with her children. (T. 159, 666).  Even during these visits to CPEP, and upon discharge, plaintiff's psychiatric examinations contained many normal findings.[16] (T. 687, 690, 696, 700, 733, 740-41, 749).  *See also* T. 582, 585, 588, 591 (mood appropriate to situation);[17] 647 (attitude toward examiner - cooperative).[18]  After plaintiff's hospitalization in late

---

[15] NP Devine's "Review of Systems" stated that plaintiff reported "dysphoric" mood, but denied agitation or behavioral problems. (T. 932).  As stated above, NP Devine's "objective" examination was "normal." (T. 933).

[16] On November 19, 2016, Dr. Tarun Kumar, M.D. stated that plaintiff was well-known to CPEP, frequently coming to stay overnight and request discharge in the morning. (T. 731-32).  Plaintiff had arrived at CPEP on November 18, 2016, after she called 911 so that she could speak with the police about her son. Dr. Kumar stated that plaintiff did not present with any psychotic symptoms during her presentation at CPEP, and that she "did well after admission." (T. 731).  He stated that plaintiff had "some anxiety and depression." (T. 731).  Her mood was angry and anxious on admission, but upon discharge the next day, her mood was listed as "Fine," and her affect "Full." (T. 732).  Her thought processes were linear and logical, her memory was intact, and her attention and concentration were fair. (*Id.*)

[17] Plaintiff was being examined for shoulder issues on October 31, 2016, November 29, 2016, January 19, 2017, and January 25, 2017.

[18] These are CPEP notes from October 10, 2016 by Dr. Ahmad Bilal, M.D. after plaintiff's daughter called 911 due to plaintiff's erratic behavior. (T. 643-44).  While plaintiff exhibited several psychiatric issues during this period of increased symptoms, plaintiff's behavior, memory, eye contact, and cognition were appropriate or intact. (T. 647).  When plaintiff was examined later the same day by Dr. John McLain, Jr., M.D. and discharged, her degree of incapacity was listed as "moderate" - it had been listed as "severe" upon arrival -, plaintiff denied having psychiatric symptoms, and Dr. McLain noted that "[n]o psychiatric symptoms were observed." (T. 656).  She was discharged upon her request. (T. 656-57).  Her discharge examination was within normal limits. (T. 657).

2016, the ALJ noted that on February 24, 2017, the records from Oswego Hospital stated that plaintiff's diagnosis was dysthymia,[19] and that her major depression was in "complete remission." (T. 157-58, 455). This is consistent with Dr. Shapiro's consultative examination of February 17, 2017. (T. 449). Plaintiff was cooperative, her social skills, overall presentation, and manner of relating were adequate. (T. 448 (Dr. Shapiro)).

Plaintiff reestablished counseling with David Blair in December 2016 as suggested in her hospital records. (T. 666, 973). At plaintiff's first appointment on December 20, 2016, LCSW Blair rated plaintiff's depression at 5 out of 10, her anxiety at 3 out of 10, and left "cognitive dysfunction" blank. (T. 973). The following week, plaintiff's depression was rated as 5-6, but her anxiety was still at 3 out of 10, even though her "cognitive dysfunction" was rated at 3. (T. 974). Her last appointment of record with LCSW Blair was on February 27, 2017, and he rated plaintiff's depression at 5, her anxiety at 5, and her "cognitive dysfunction" as 8 because she exhibited "worry thoughts, negative self-reference, racing thoughts [and] memory problems." (T. 975).

The ALJ also discussed the medical records associated with plaintiff's physical ailments, and even though these physicians were not diagnosing plaintiff's psychiatric condition, they often noted in the physical examination portion of their reports, that

---

[19] Dysthymia is defined as a persistent depressive disorder, but less severe than major depression, although sometimes lasting longer. https://www.health.harvard.edu/a_to_z/dysthymia -a-to-z. This is consistent with the plaintiff's statement that she has been depressed for a lengthy period of time.

plaintiff's mental status was normal.[20] (T. 161).  On February 5, 2017, plaintiff saw her primary care provider for a physical problem. (T. 852).  The report stated that plaintiff had a "past medical history" of anxiety and depression, but noted that plaintiff's mental state was "normal," with a "normal affect." (T. 854).  On May 27, 2017, plaintiff saw a primary care provider for poison ivy and "denied" depression or anxiety. (T. 847-50).  On August 9, 2017, plaintiff saw one of her primary care providers for swelling in her eyelids. (T. 842).  The doctor stated that plaintiff had a "past" history for anxiety and depression, but that plaintiff "denied" both that day. (T. 850).

Without repeating every bit of the ALJ's analysis, it is clear that she took the entire record into account and weighed the conflicting evidence to determine plaintiff's RFC for work.  It is the province of the ALJ to resolve conflicting evidence. *Veino v. Barnhart*, 315 F.3d 578, 588 (2d Cir. 2000). While there may or may not be missing records from Circare,[21] the ALJ had sufficient evidence to determine plaintiff's condition during the relevant time, and her determination was supported by substantial evidence. *See Sarah C. v. Comm'r of Soc. Sec.*, No. 5:19-CV-1431 (FJS), 2021 WL

---

[20] The ALJ noted that plaintiff had no trouble seeking emergency treatment for various minor conditions during the relevant period. (T. 161).  The ALJ stated that "[i]n none of these records is the claimant observed to appear anxious, having an anxiety attack, or acting abnormally, in settings which she is both outside of her home and interacting with emergency department staff and medical professionals, with whom she is not familiar." (*Id.*)  This is inconsistent with many of Dr. Zebrowski's stated limitations, including plaintiff's more than serious limitation in her ability to ask simple questions or request assistance. (T. 1001). Dr. Zebrowski checked the box "inability to meet competitive standards," which is more restrictive than "seriously limited." (*Id.*)

[21] At the February 26, 2019 hearing plaintiff's counsel did not indicate that there were records missing, nor did he request additional time to produce records. (T. 81).  Plaintiff's counsel provided Dr. Zebrowski's MSS to the agency on February 14, 2019. (T. 998).  The ALJ did note the "gap" in records from Circare between the "intake notes" and Dr. Zebrowski's 2018 report, but quoted Dr. Zebrowski's 2018 opinion which was inconsistent with the severe symptoms alleged by plaintiff. (T. 161).

1175072, at *9-10 (N.D.N.Y. Mar. 29, 2021) (declining to remand when notwithstanding the possibility of missing records, the ALJ had consistent and sufficient evidence to develop plaintiff's RFC without recontacting plaintiff's treating physician).

      **WHEREFORE**, based on the findings above, it is

      **ORDERED**, that the decision of the Commissioner is **AFFIRMED** and this case **DISMISSED**, and it is

      **ORDERED**, that the Clerk enter judgment for **DEFENDANT**.

Dated: April 15, 2021

Hon. Andrew T. Baxter
U.S. Magistrate Judge